WO

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Priscilla S. Kuhn,<br><br>                    Plaintiff,<br>v.<br><br>UnumProvident Corporation and Provident<br>Life and Accident Insurance Company, et al.,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CV 04-368 TUC DCB

**AMENDED**
**ORDER**

On September 30, 2005, this Court granted Defendants' motion for a determination that ERISA governs this action.  Subsequently the parties have filed "Trial Briefs" and submitted evidence to this Court for a determination of coverage.  The Court finds for the Plaintiff and orders the payment of benefits from the date of termination, March 10, 2003, with interest and reinstatement of monthly benefits.

## UNUM Insurance is a Proper Defendant

Defendant argues that UNUM Insurance is not a proper party to this action because it is a third-party insurer and not the plan or the plan administrator, which are the only entities subject to liability under ERISA.  29 U.S.C. §1132(d)(2).  This is contrary to admissions made by Defendants within the context of its prior argument to this Court that ERISA governs this action.  Then, UNUM Insurance argued that the policy, instituted as an ERISA policy by Netwest Development Corporation (Netwest) continued as an ERISA policy, even though the Plaintiff left Netwest's employment, Netwest filed for bankruptcy, stopped paying the premiums on the policy, Plaintiff took over the payment of the premiums and dealt directly with UNUM Insurance regarding the policy.  UNUM was the plan administrator.

Specifically, Defendant submitted the following:

. . . It does not necessarily follow (as plaintiff argues) that any policy for which there are limited administrative actions by the employer falls outside of ERISA.  Thousands of ERISA plans, once established by the employer, place minimal burdens, if any, on the employer to maintain the plan. Instead, the *"administrative duties" usually fall to the insurer*.  That is what Congress intended.

A "central objective" of ERISA is "administrative ease for employers." Congress' objective of "administrative ease" would be undermined if it made the administrative burdens so costly and inflexible that employers would simply decline to sponsor benefit plans.  To ease this burden, ERISA expressly provides that a plan may be "established or maintained" by using insurance.  *In other words, an employer may delegate its "administrative duties" to an insurance company.*

In this vein, "the fact that the statute defines an 'employee welfare benefit plan' as being 'established or maintained' (rather than, established *and* maintained') by an employer, allows for a situation that exists here, where an employer 'establishes' a plan, goes defunct, and many years later, the plan is still subject to ERISA."

(Ds' Reply in Support of Motion for Determination that ERISA Applies at 10-11), (quotations omitted) (emphasis added).

The arguments presented above by Defendants are persuasive because the contrary argument, which Defendants now submit, does not make sense.  How could an ERISA plan exist where an employer has no administrative duties, unless plan administrative duties are provided by the insurer.  This Court could not have found the insurance policy, originally established as an ERISA plan continued as an ERISA plan, if UNUM Insurance Company was not the plan administrator because UNUM did not dispute the Plaintiff's assertion that Netwest was not.  *See Everhart v. Allmerica Financial Life Insurance Co.* 275 F.3d 751 (9th Cir. 2001) (ERISA action can be maintained against the ERISA plan, itself, or the plan administrator).  In *Everhart*, both parties conceded that the employer was the plan administrator. Here, both parties conceded that the employer was not the plan administrator.  UNUM Insurance is the proper Defendant in this action.

2

<u>Disability Benefits</u>

<u>Standard of Review and Policy Provisions</u>

Plaintiff seeks long term disability benefits under an individual occupational policy issued by Defendants.  The parties agree that the standard of review is *de novo*. "The review is limited to the record before the administrator and the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan."  *Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002).   The parties present the record and their arguments to the Court by simultaneously filed trial briefs and responses.

Plaintiff has the burden of proving that she is totally disabled.  *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 518-19 (1st Cir. 2005);   *Gravatt v. Paul Revere Life Ins. Co.*, 2005 WL 2789315 at *8 (Ariz. October 25, 2005).

The policy provisions at issue in this case are as follows:

Total Disability means that due to Injuries or Sickness:

1.      you are not able to perform the substantial and material duties of our occupation; and

2.      you are under the care of and attendance of a Physician.

Your occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled.

If disabled, Plaintiff is entitled to a monthly benefit of $2,950.00, payable for life, because she initiated her claim on March 23, 2001, five months before she turned 60 years old.

<u>Prior Occupation: CEO of a Major Development Company</u>

The claim form she filed on March 30, 2001, explained that she was suffering from "medical depression" since December 10, 2000, and that she had been unable to work since January 16, 2001.  (P's Ex. 4 at PLACL00016.)  She described her occupation as "Developer, President/CEO of Netwest Development Corporation, an S-corporation, with 500 or so employees working for her.  *Id.* at PLACL00009.  She explained that she

had been working approximately 60 hours per week, but others had assumed her duties. *Id.* She described her major occupational duties in percentages as follows: 20 % involved travel to various locations;  20 % involved telephone communications; 40 % involved written communications and supervision, and 10 % involved meetings and financial negotiations.  *Id.* at PLACL00008.

Her work day was spent as follows: 1) 1/3 to 2/3 of it was spent giving directions to others; 2) greater than 2/3 was spent influencing others in their opinions/attitudes/and judgments; 3) up to 1/3 was spent performing duties that were potentially dangerous to herself or to others and or making decisions that will affect the well-being of others; 4) greater than 2/3 of her day she used sound judgment and made decisions based on subjective/concrete information; 5) she spent the same time engaging in work that involves interpersonal relationships in job situations beyond receiving work instructions; 6) 1/3 of her day she made generalizations, evaluations, and decisions based on measurable or verifiable objective criteria.  *Id.* at PLACL00006.

"Plaintiff founded Netwest in the mid-1980s as a privately-held company owned and operated predominantly by a small group of Tucson women.  Netwest had, by 1995, become a multi-million dollar business operating multiple multifamily, retirement, and assisted living facilities throughout Arizona."  (Ds' Brief at 4.)

Ms. Alice Udall, acting President and CEO who replaced the Plaintiff at Netwest, reported to UNUM that the Plaintiff was "a major decision maker for a giant corporation," responsible for "overseeing the entire operation and accounting function." (P's Ex. 5 at PLACL00212.)  "The company specializes in managing and developing apartments.  Their first management property was located in Kingman, Arizona.  The business then began to branch out and developed a building to house elderly individuals." *Id.* Eventually, Netwest managed three buildings in Kingman and one in Casa Grande. *Id.* They also had assisted living homes, three in Kingman and others located in Peoria, Yuma, Tucson, and Green Valley, Arizona.  *Id.* Ms. Udall described the Plaintiff as

being "mentally exhausted" from "overseeing four joint venture projects and two other properties." *Id.* Her primary duties were to find funding for the company's various projects. *Id.*

Based on this record, the Court rejects Defendants' assertion that Plaintiff's depiction of herself as "President and CEO of a 'major corporation' and 'major development corporation'" is "a transparent attempt to re-define plaintiff's occupation as much narrower in scope than it actually is," and "nothing more than 'lawyer talk' attempting to aggrandize a local business into something akin to General Motors or some other Fortune 500 company . . ." (D's Response at 3.) Whether or not Netwest was on the same scale as General Motors or some other Fortune 500 company, it was a multi-million dollar corporation, with several hundred employees, involved in several ongoing joint ventures, and is, therefore, accurately described as a major corporation and/or major development corporation.

The label, CEO of a major development corporation, is not "spin." It distinguishes the types of things the Plaintiff did as CEO at Netwest.   It accurately reflects that the Plaintiff "performed higher level, more complex, more stressful duties than a garden-variety president and chief executive officer"[1] of some smaller, less ambitious, corporation would perform, when she was engaged in the substantial and material duties of her occupation: traveling, talking on the telephone, writing business correspondence, managing and supervising corporate affairs, and participating in meetings and financial negotiations.

When Defendants interviewed Ms. Udall, she explained that Ms. Kuhn founded Netwest in 1985. She presided over its growth and success until 2000, when it filed for Chapter 11 bankruptcy. Netwest became over-extended because a business partner failed

---

[1]*Id.* (criticizing Plaintiff for attempting to make her occupation appear thus).

to meet its commitments and left Netwest holding the bag, resulting in numerous law suits being filed against it.  (P's Ex. 5 at PLACL00212-211.)[2]

As the company sought to correct its financial problems, the Plaintiff had increasing difficulty giving up the altruistic vision she had for the corporation.[3]  Ms. Udall described Plaintiff as "a major decision maker for [the] giant corporation who became paranoid and whose behavior became erratic."  *Id.* at PLACL000212.

Throughout 1998-1999, Plaintiff began to loose her temper and go off on "tangents."  When faced with problems she became accusatory of "they" and would claim "I didn't do anything."  As the business was going through the bankruptcy the lawyers had a difficult time working with her.  There was an incident where Plaintiff verbally abused a CPA hired in the bankruptcy case.   The accounting company threatened to pull their people out of the project if she was left in charge.  Anytime she got involved in company business, it tore her up.  Claimant's own abnormal mental behavior caused the Board to ask her to leave.  "The incidents of Ms. Kuhn 'losing it' were too much to overcome."  "At the Trustee hearing the claimant 'lost it' and appeared 'really disturbed.'"  Ms Kuhn "got to the point where she wasn't making rational, good or accurate decisions."  *Id.*

<u>Disability Claim and Attending Physicians' Statements</u>

On the disability claim form, the Plaintiff described herself as basically unable to perform any of her major occupational duties, except for answering a few telephone calls.  *Id.* at PLACL00008.  She reported that her treating physicians had restricted all duties that caused emotional stress.  (P's Ex. 4 at PLACL00007.)  Her three treating physicians filed attending physician's statements.

---

[2]Plaintiffs exhibits are numbered in reverse, in receding numeric order.

[3]Netwest "spearheaded the development and operation of innovative new housing projects designed for frequently overlooked, vulnerable constituents."  "Netwest was the culmination of Plaintiff's personal dream to build strong community partnerships by encouraging private and public sector involvements."  (P's Ex. 5 at PLACL00147.)

On April 19, 2001, Plaintiff's family practice doctor, Dr. Abraham R. Byrd, filed an attending physician's statement based on his treatment of the Plaintiff from February 7, 2001, to April 16, 2001, for "major depression."  He described symptoms of: "Inability to concentrate, difficulty processing, irritability, inability to handle others, ↓sleep, hard to get up."  He restricted and limited the Plaintiff from "any work."  He was unsure when she might be able to return to work, estimated January 2003, but deferred to her psychiatrist and counselor to make this determination.  (P's Ex. 5 at PLACL00020.)  Dr. Byrd, referred Plaintiff to Dr. Jones, a psychiatrist.

Dr. Marshall Jones based his statement on treatment from February 9, 2001, to April 30, 2001.  Dr. Jones made the following objective findings: "Pt looked depressed and tearful at times," with symptoms of "depressed mood, crying spells, anxiety, anger, irritability, trouble concentrating."  "Pt lost concentration, creativity, and became very irritable, angry and depressed."  He wrote that as of November 2000, she was no longer able to direct a company and exercise her creativity or think as clearly as in past."  His diagnoses was: "296.32, major depression; 309:28, adjustment with depression and anxiety."  Dr. Jones saw the Plaintiff every two weeks, approximately.  He responded that he did not know when she would be able to return to work "– maybe will take 1 year or more."  (P's Ex. 4 at PLACL00019.)

Jeanne Webber, a counselor Plaintiff had previously seen, saw her in relation to this claim on March 30, 2001, and every week thereafter.  She filed her attending physician's statement on April 13, 2001.  She diagnosed Plaintiff with Adjustment Disorder, 309.28, symptoms of "clinical depression, obsessive compulsive tendencies, high anxiety."  As to restrictions, Ms. Webber wrote: "Patient unable to function cognitively without forgetting time.  Unable to focus clearly.  Talks excessively.  Obsesses.  Unable to work at this time.  Unable to hold down any job at this time."  The counselor was unable to assess when she might return to work.  (P's Ex. 4 at PLACL00021.)

Defendants requested further documentation from Plaintiff's psychiatrist and her counselor. Dr. Jones and Ms. Webber completed and returned a Physician/Therapist Questionnaire in May, 2001. Dr. Jones also provided his contemporaneous treatment notes. Ms. Webber provided a narrative background report along with her questionnaire.

Dr. Jones again issued the diagnosis of major depression, recurrent O.C.D. and panics, adjustment anxiety and depression.

He provided the same information he had provided earlier, but with more detail. He gave the Plaintiff a GAF rating of 65, it was 55 on 2/9/01, 65 for the past year, but she had had a GAF of 90 two years prior. (P's Ex. 5 at PLACL00193.)

A Global Assessment of Functioning (GAF) rating is part of a standard mental health examination which assesses a person on five levels: Axis I includes the clinical [mental] disorders including other [mental] conditions that may be a focus of clinical attention; Axis II records personality disorders; Axis III includes all general medical conditions; Axis IV addresses psycho-social and environmental problems; and Axis V is the GAF. Although GAF ratings are typically made on a 90-point scale, the rating criteria are described in nine broad categories, with many researchers combining GAF scores into fewer categories. Generally, patients can be classified by using five categories of GAF scores: 1 to 40, pervasive impairment; 41 to 50, serious impairment; 51 to 60, moderate impairment; 61 to 70, mild impairment; and 71 to 90, minimal impairment. http://ps.psychiatryonline.org: Psychiatric Services 53:730-737, June 2002, "Global Assessment of Functioning Ratings and the Allocation and Outcomes of Mental Health Services," Rudolf H. Moos, Ph.D., Aran C. Nichol, A.B. and Bernice S. Moos, B.S.

On a scale of 1 to 5 (1 being none, 2 being mild, 3 being moderate, 4 being moderately severe, and 5 being severe), Dr. Jones painted the following picture: she was fully capable of attending to her personal needs, moderately to severely impaired in regard to dealing with other people. For example, she could carry out and remember instructions and perform tasks involving minimal intellectual effort. She became severely

impaired when dealing with others became more involved or extended for a longer (two-hours) time period.  She was severely impaired, panicky, angry or depressed, when it came to working under stress, managing or supervising others, or performing any of the work related activities required by her job.  (P's Ex. 5 at PLACL00188-186.)

Dr. Jones diagnosed the Plaintiff based on her self reporting of crying spells 3 to 4 times a day of marked severity for 10 minutes to 4 hours at a time; panic attacks twice a week of marked severity for 3 to 30 minutes at a time; agoraphobia[4] almost all the time of marked severity for approximately 3 months, and anger once every 3 to 4 days of marked severity for 2 hours to a week each time.  *Id.* at PLACL00192.  He prescribed Celexa to balance her serotonin levels, Xanax to reduce her anxiety, and Ritalin to improve her energy.  *Id.* at PLACL00190.  He also prescribed rigorous exercise for the Plaintiff and considered referring the Plaintiff to a support group, but concluded that no support group seemed appropriate so she was engaged in therapy with a counselor, Jeanne Weber.  *Id.* He reported that Plaintiff saw him every 1 to 2 weeks, and his goal was to get her back to normal function.  *Id.* at PLACL00188-186.

In conclusion, Dr. Jones identified restrictions, limitations and/or skill deficits of severe depression, panic attacks, impairment in high level concentration, and inability to control her temper.  *Id.* at PLACL00185. He explained it was premature to think about returning to work as this was the source of many stressors.  *Id.* at PLACL00190-189. Whereas other areas of her life were not affected, such as gardening, relationships with close family members and one true friend.  *Id.* at PLACL00189.  He believed that it was unlikely the Plaintiff would return to part-time or full-time work in her previous

---

[4]Agoraphobia is the fear of developing panic-like symptoms (e.g., dizziness or diarrhea). Anxiety about being in places or situations from which escape might be difficult (or embarrassing) or in which help may not be available in the event of having an unexpected or situationally predisposed panic attack or panic-like symptoms.

occupation because it was unlikely she would expose herself to such a high stress occupation in the future. *Id.* at PLACL00185.

In May the Plaintiff's therapist, Jeanne Webber, repeated her diagnosis of adjustment disorder with mixed anxiety and depressed mood, major depressive disorder, panic disorder with agorophobia obsessive-compulsive tendencies.   Ms. Webber was seeing the Plaintiff on a weekly basis for one hour appointments. *Id.* at PLACL00174.

She based her diagnosis on interviews with family members, direct observation, and evaluations of specific symptoms: suicidal ideation, panic attacks accompanied by agoraphobia, mental confusion, and depression.  *Id.* at PLACL00175.  The therapist concluded that Plaintiff's social anxiety prevented her from returning to her occupation. *Id.* at PLACL00173.   She did not anticipate that Ms. Kuhn would return to work part time or full time in her prior occupation and that her instability to handle <u>any</u> stress ruled out vocational rehabilitation.  *Id.*

The counselor reported that in all areas of question, the Plaintiff was severely impaired.  *Id.* at PLACL00172.  For example: as evidence to support her assessment that Plaintiff was severely impaired in her ability to relate to other people, the counselor wrote: "Daughter of client encourages mother daily to leave house without success 90% of the time."  *Id.* at PLACL00171.  Daily activities of attending meetings and socializing with others were severely impaired because "client used to be highly active politically in the community (high profile)."  *Id.*  The counselor reported that Plaintiff had deterioration of personal habits and interests as she had significant weight loss and difficulty reading, which she had loved to do.  *Id.*

Plaintiff was severely impaired in her ability to understand, carry out, and remember instructions.  *Id*.  Plaintiff was confused.  She presented the counselor with an "Easter" card, which was really a card offering encouragement in troubled times.  *Id.* Appointments had to be rescheduled because Plaintiff forgot them or came at the wrong time.  *Id.* at PLACL00168, PLACL00178.

10

The counselor found that Plaintiff's obsessive-compulsive tendencies caused her to react strongly to her surroundings and if her immediate environment was not orderly and aesthetically appealing to her she became extremely agitated.  (P's Ex. 5 at PLACL00178.) The therapist found severe impairment of Plaintiff's intellectual abilities because unpredictability of confusion interrupts intellectual activities.  *Id.* at PLACL00170. Plaintiff's concentration is equally impaired by bouts of disorientation, verbal tangents, and obsessing.  *Id.* at PLACL00169.

Plaintiff could not respond to supervision because she had difficulty trusting anyone other than her husband.  *Id.* at PLACL00170.  Her ability to have contact with others was limited to a small trusted group of individuals.  *Id.*  She could not work where it required regular contact with others because she had severe panic attacks.  *Id.*  For example, she had to relocate to another room on one occasion when accompanying her husband to a business meeting.  *Id.*  She was too fearful to make independent judgments. *Id.* at PLACL00169.  In a safe environment, such as when she was with her husband, she could perform some simple tasks. *Id.*  "Client [was] wholly incapable of performing 'under fire' in stressful situations such as emergencies, critical or dangerous situations." *Id.*  Therefore, she would be incapable of performing the work relative to her occupation. *Id.*

The counselor responded that returning to work was not a goal of therapy because "she is incapable of pursuing gainful employment.  Therapy centers around building trust, allowing and encouraging the expression of unresolved feelings and, hopefully, eventually getting back to a state of clarity that is free of depression."  *Id.* at PLACL00177.  Besides seeing her psychiatrist, Dr. Jones, the treatment plan did not include other outside support groups or rehabilitation programs.  *Id.* at  PLACL00168. "Client experiences severe panic attacks; social anxiety; and agoraphobia, whenever she leaves her home."  *Id.*  To approximate her home environment, her counselor had accommodated a few home sessions.  *Id.*

11

1      After receiving this additional information in May of 2001, Defendants conducted

2  an in-house review of the Plaintiff's claim in June.  First, Jane Price reviewed the file.

3      Ms. Price concluded that the record supported the diagnosis of Adjustment

4  Disorder because the onset of symptoms was in response to a business stress, *id.* at

5  PLACL00202, but she erroneously questioned the Plaintiff's assertion that she had been

6  asked to resign for being disruptive in the office because Ms. Price over-looked the

7  information provided by Ms. Udall.  *Id.*

8      Ms. Price found that there was no support for the ongoing diagnosis of major

9  depression because Plaintiff was engaging in activities such as gardening, dog training,

10  decorating, and exercising, and these activities indicated she did not have significant

11  problems with energy, interest, or motivation.  *Id.*  She ignored Dr. Jones ancillary

12  prescriptions of exercise and his encouragement to Plaintiff that she should engage in safe

13  non-stressful activities such as training her new puppy, exercising, and swimming.

14  Instead, she found that these activities exemplified that Plaintiff's condition was not

15  severe and that it had improved by May 29, 2001.  *Id.* at PLACL00202, 00201. Because

16  Plaintiff was pursuing interests apart from her occupation and Dr. Jones' records reflected

17  that on 5/29/01 she was sleeping well, Ms. Price estimated that Plaintiff could return to

18  work within 6 months, if not already.  *Id.* at PLACL00201.

19      Ms. Price concluded that "considering the claimant's age[5] and the significance of

20  the business problems reported, it seems unlikely that the claimant would return to her

21  occupation even as her acute symptoms resolve."  *Id.*  She also questioned whether

22  claimant's avoidance of social situations was due to true anxiety or due to embarrassment

23  over the public bankruptcy and legal difficulties.  *Id.*  Ms. Price referred Plaintiff's claim

24  for doctoral level review.  *Id.*

25

26  ─────────────────

27      [5]Neither party presents any evidence or argument regarding any age criteria relevant to the
   "total disability" determination to be decided by this Court.

28

Dr. David Goldsmith reviewed Ms. Price's "thoughtful analysis and summary, as well as the clinical evidence in the claim file." *Id.* at PLACL00205. He concurred with her findings and conclusions, with some minor additions. *Id.* at PLACL00205-204.

He concluded that there was no substantiated clinical evidence supporting the Plaintiff's self-reported experiences. That there was an obvious and dramatic difference between Dr. Jones' portrayal of the Claimant through 3/29/01 and Ms. Webber's subsequent depiction of the Claimant as a home-bound, mentally impaired, verbose shell of the woman she was. He criticized Ms. Webber's retrospective summary as not being an acceptable substitute for contemporaneous notes,[6] which should be obtained. *Id.* at PLACL00204.

He was critical and suspicious of Plaintiff's claim because litigation might be a plausible reason for her to allege psychological distress and damages. Such secondary gain might cause Plaintiff to overstate the nature and extent of her psychological and functional deterioration. He recommended further investigation to determine the validity and reliability of the Claimant's reported clinical status, as well as establishing whether she is impaired by a mental illness. Without further investigation, he could not determine whether the Claimant was receiving appropriate care for her allegedly serious and debilitating mental illness, particularly he wanted Ms. Webber's notes and treatment plan. *Id.*

Dr. Goldsmith referred the case for independent medical examinations (IME) by Anne M. Herring, Ph.D. for a neuropsychological evaluation and to Dr. Barry Morenz, M.D. for a psychiatric evaluation.

<u>The IMEs</u>

Dr. Herring conducted her IME on October 18 and 25, 2001 (P's Ex. 7 at PLACL00286-279.) She noted that generally the Plaintiff was hostile, angry, sarcastic,

---

[6]Ms. Webber does not keep progress notes or formal reports of her counseling sessions. P's Ex. 7 at PLACL00285.)

not cooperative, and failed to give her best performance on the tests.  *Id.* at PLACL00284-283.  Thus, the evaluation results might underestimate her cognitive abilities.  *Id.*

In general, Plaintiff's performance on the neurological tests administered by Dr. Herring were average to above average, with some limited areas of impaired functioning. *Id.* at PLACL00282-281.   Plaintiff performed well on a memory test designed to detect flagrant malingering, *id.* at PLACL282, and Dr. Herring concluded that her performance was affected by  carelessness in taking the tests.  *Id.*

In summary, Dr. Herring formed the impression that Plaintiff "did not put forth a consistently good effort in performing the administered tests."  *Id.* at PLACL00281.  For example, "the scores on the measures of intellectual ability were not commensurate to her education and occupational attainment and, while possibly suggestive of a decline from a previous level of functioning, more likely reflected her poor effort."  *Id.* at PLACL00280 Overall, with the exception of one motor function test, the results of the evaluation did not conclusively document impairment in any of the cognitive domains assessed."  *Id.* While her performances were somewhat lower than expected, Dr. Herring attributed the results to poor effort rather than a significant cognitive decline and found that, regardless, her overall level of cognitive functioning remained good.  *Id.* at PLACL00281.

Dr. Herring concluded that her performance was not consistent with significant brain dysfunction and did not suggest a neurological disease process.  There was no evidence to infer that Plaintiff would have difficulty in work-related tasks and activities due to cognitive deficits.  Her impression was that Plaintiff experienced a significant number of emotional symptoms and was preoccupied by her distress.  While emotional distress and lack of motivation might be major contributors to her reported functional disability, psychological distress did not consistently impair her performance on cognitive testing as demonstrated by strong performances on several of the cognitively more challenging tasks.  Resolution of her emotional distress might help her to perceive herself

as more functional.  However, it was unclear as to whether her emotional distress would prevent her from being able to return to her previously high level of functioning. *Id.* at PLACL00280.

On November 8, 2001, Dr. Barry Morenz, Clinical Psychiatrist, conducted his IME of the Plaintiff.  He reviewed all the relevant records, including Dr. Herring's report. His diagnosis was major depression, single episode, in partial remission, panic disorder without agoraphobia (provisional).[7]  He gave her a GAF rating of 70.  *Id.* at PLACL00319.

Dr. Morenz explained that Plaintiff's "depressive and anxiety symptoms interfere[d] with her confidence, concentration, and focus which reduced her cognitive efficiency and diminished her effectiveness in carrying out specific tasks at her job, such as chairing meetings, soliciting investors, initiating new projects, hiring employees, and setting policies." *Id.* at PLACL00310.  He noted that she was still "experiencing considerable affective discomfort especially with respect to ongoing problems at Netwest Company in which she still held a 25 percent interest.  There is ongoing litigation regarding the company, all of it upsetting to her." *Id.*

He believed that the onset date of her disability was November, 2000, and that she was totally disabled until June, 2001, when she began to feel somewhat better.  *Id.* at PLACL00312.  In his opinion the primary obstacle to Plaintiff's full recovery was her lack of self-confidence, which in combination with depression and anxiety affected her ability to function as a leader and CEO.  *Id.* at PLACL00318-314.  He explained that her past treatment, aimed at amelioration of symptoms had been appropriate, but she now needed treatment to regain her self confidence so that she could return to her occupation as a CEO.  *Id.* at PLACL00312-311, 309.

---

[7]He found that Plaintiff had experienced several panic attacks, but had not been worried about her panic attacks or their consequences and had not had any significant change in behavior related to the attacks so he gave her a provisional diagnosis of panic disorder, without agoraphobia.  See n. 4.

He noted that over the past several months, "the intensity of her treatment has diminished considerably."  *Id.* at PLACL00312.  He believed, "that Ms. Kuhn could benefit from treatment with a psychologist and/or psychiatrist who may have experience working with business and community leaders who have suffered setbacks and reversals in order to assist them in overcoming doubts and trepidations about their own abilities and judgment," but such treatment would need to be considerably more intensive than it had been, "perhaps occurring on a twice-weekly basis with specific goals and objectives."  *Id.*  He added that retreats with other business leaders, group therapy, and more intensive psychotherapy probably with a cognitive behavioral orientation would be indicated to help [her] overcome her current hesitancies about returning to work as president and CEO of a company."  *Id.* at PLACL00311.  Because the Plaintiff is an "energetic, task-oriented woman by nature, once she was determined to engage in treatment to restore her confidence, he was optimistic that within a six-month period of time she could return to her occupation as a CEO managing a company.  *Id.* at PLACL00310.

Defendants asked Dr. Morenz to, and he did, prepare a treatment plan, including recommendations of psychotherapists that would "help her to discriminate between being unable to assume leadership responsibilities and choosing not to assume those responsibilities because of other preferences or priorities at this stage in her life."  (P's Ex. 8 at PLACL00377.)

On February 20, 2002, Defendants contacted Plaintiff to inform her that UNUM believed the IMEs did not support permanent restrictions or limitations.  *Id.* at PLACL00390.  Defendants enclosed a check for benefits for February 8, 2002 to August 8, 2002, the 6-month period of treatment that Dr. Morenz estimated was needed to return Plaintiff to her occupation as a CEO.[8]  Previously, Defendants were paying benefits on a

---

[8]The Court does not reach the merits of Plaintiff's argument regarding the impropriety of Defendants' advance pay and close (APC) treatment of Plaintiff's claim.

16

monthly basis for a disability period beginning May 8, 2001, based on an onset date of disability of February 7, 2001, with a 90-day elimination period.[9]  (D's SOF at ¶ 24.)

Defendants' wrote: "In order to consider additional benefits beyond August 8, 2002, we must receive proof that you have engaged in and complied with the additional treatment as outlined above and are motivated to return to work in your occupation.  In order to monitor your progression in treatment, we have enclosed monthly supplemental claim forms to be submitted for the next 6 months.  If a full time return to work is not met by August 8, 2002, we must evaluate from the clinical standpoint if there are current occupational restrictions and limitations causing an inability to perform the duties of your occupation." *Id.* (P's Ex. 8 at PLACL00390-389.)

On March 23, 2002, Dr. Jones responded on Plaintiff's behalf.  He had reviewed the IME reports by Dr. Morenz and Dr. Herring.  While he agreed with much of Dr. Morenz' findings, he complained that it was unethical for UNUM to insist that Plaintiff change therapists unless there was some compelling reason.  *Id.* at PLACL00413.  He informed UNUM that he had already referred the Plaintiff for individual psychotherapy to Dr. Hayward Fox, Ph.D.  *Id.* at PLACL00413-412.

He agreed with Dr. Herring's assessment that Plaintiff's I.Q evaluation of 108 underestimated her abilities because of her anger and uncooperativeness.  He was sure that at one time the Plaintiff functioned with an I.Q. of at least 150 so she had lost, perhaps one-third of her cognitive function..  *Id.* at PLACL00414.  However, he expected her to fully regain her cognitive abilities.

He reported that the Plaintiff was still uncomfortable and delayed making phone calls necessary to her interests that she easily would have made in the past.  *Id.* at PLACL00412.  Her current ability to read and comprehend material remained significantly impaired compared to the very high level it had been in the past.  *Id.*  He

---

[9]The previous benefit payments had been made monthly by Defendants, with Reservation of Rights (ROR).  There are no ROR issues in this case.

expressed concern that Plaintiff still showed spontaneous panic attacks after having been on a high dose of Celexa, 80 mg a day, for two months and one week. He had expected to totally eliminate the spontaneous panic but her recovery was impeded by the ongoing assaults to her character and integrity from Netwest legal proceedings and actions by the Netwest Board of Directors. *Id.* Her mood was improved, and he expected further improvement and hoped her to be totally free of spontaneous panics.

He expected the Plaintiff to return to functioning as an altruistic, ethical community-builder, but he did not think it possible for her to ever function as a CEO in a company of the magnitude of Netwest without compromising her basic integrity and ethics. *Id.* In his opinion, the Plaintiff would never be able to return to a job as a CEO of a company as large as Netwest, "<u>where she no longer has complete control over the ethical, altruistic goals in the mission of the company.</u>" *Id.* at PLACL00413 (emphasis in original).

As Defendants correctly note, "Plaintiff's disability coverage insures her occupation, not her job. (D's Response at 3 (citing *Lasser v. Reliance Standard Life Insur. Co.*, 146 F. Supp. 2d 619, 636 (NJ 2001) ("regular occupation" does not mean only the insured's previous job); *Dawes v. First Unum Life Insur. Co.*, 851 F. Supp. 118, 121-22 (N.Y. 1994) (in an occupational insurance policy, "regular occupation" is defined more narrowly than any means for making a living, but is not limited to the insured's particular job); *Kinstler v. First Reliance Standard Life Insur. Co.*, 181 F.3d 243, 253 (2nd Cir. 1999) ("regular occupation" defined with some consideration of the nature of the institution where she was employed; defined as a position of the same general character as her job). Plaintiff's prior occupation was as CEO of a major development company, not as CEO of an ethical and altruistic major development company nor as an ethical and altruistic CEO. If Plaintiff is capable of functioning as a CEO of a major company she is not totally disabled. Ethical impediments are not relevant to Plaintiff's benefit claim.

To this extent, Dr. Jones' attending physician's statement was properly rejected by Defendants.

Disability Claim: Post-August 8, 2002

As August approached, the Plaintiff contacted UNUM regarding continued benefits. On July 17, 2002, UNUM responded that it could not consider paying the costs of ongoing treatment with Dr. Jones, as he had been her attending physician since the onset of her disability claim. *Id.* at PLACL00426. They were, however, "willing to consider payment for additional psychotherapy with Dr. Fox upon receipt and review of [her] medical records."

October 3, 2002, Dr. Fox completed a Physician/Therapist Questionnaire for UNUM. He gave the Plaintiff a current GAF rating of 51, with a highest GAF in the last year of 51. (P's 9 at PLACL00524.) He made the same diagnosis of major depression, 296.32, and adjustment disorder, 309.28, but added an Axis III diagnosis of possible fibromyalgia. *Id.* He noted for Axis V that there was extensive legal involvement affecting her condition. *Id.*

Dr. Fox saw Plaintiff for 45 minute sessions as follows: twice in January (1/8/02, 1/28/02); twice in February (2/5/02, 2/19/02); four times in March (3/5/02, 3/12/02, 3/21/02, 3/29/02); three times in April (4/8/02, 4/15/02, 4/29/02); five times in May (5/3/02, 5/9/02, 5/17/02, 5/28/02); not seen in June; twice in July (7/22/02, 7/29/02); once in August (8/29/02); twice in September (9/?/02, 9/28/02), and once in October (10/1/02) before he completed UNUM's questionnaire. *Id.* at PLACL00520.

He gave her current status as still being depressed and anxious, but panic seemed to be abating. Her speech was a bit less pressured. *Id.* at PLACL00524. Plaintiff reported to him, and he observed and confirmed with Plaintiff's husband and daughter, the following symptoms and complaints: severe muscle pain daily, all day; anxiety that makes concentration difficult; depression and despair that clouds her mind; anger, hurt, and resentment that preoccupies her thinking in a ruminative, obsessive manner. *Id.* at

PLACL00523.  He considered her functional capacity to work with others to be limited because "depression, anxiety, pain and anger make it difficult to maintain attention, concentration, perform under stress of work load or critical situation and complete a work day without interruption from emotional and physical symptoms (pain)." *Id.*

In relation to UNUM's questions regarding Plaintiff's ability to return to work and a time from for her return, he responded that he did not know.  "Ms Kuhn is still in acute distress.  We are trying to stabilize her.  Returning to work is not the focus and would not be an appropriate focus." *Id.* at PLACL00520.

Dr. Fox began noting Plaintiff's complaints of body aches and pain in July 2002, (P's Ex. 10 at PLACL00538), and continued to make such notes in August through November of 2002, *id.* at PLACL00537-532).  Dr. Jones' records contained similar notations in June, 2002, (P's Ex. 8 at PLACL00420), July, *id.* at PLACL00437, and October, 2002, (P's Ex. 9 at PLACL00510-11).  By August 8, 2002, Plaintiff's family physician, Dr. Byrd, began listing possible fibromyalgia in his assessments of Plaintiff's medical condition, (P's Ex. 10 at PLACL00574), and repeated the assessment in September, *id.* at PLACL00575, and on November 4, 2002, *id.* at PLACL00576.[10]

By September, 2002, subsequent to receiving multiple Attending Physician's Statements, and Dr. Fox' treatment notes, UNUM noted that Plaintiffs' medical records suggested "ups and downs" of mood and recent worsening due to legal matters.  (P's Ex. 12 at PLACL00689.)  Defendants ordered another IME of the Plaintiff from Dr. Morenz, which was conducted on January 21, 2003.

---

[10]On October 16, 2001, Dr. Byrd noted that Plaintiff reportedly: "feels she is coming apart physically, although thinks she is doing somewhat better mentally."  (Plaintiff's Ex. 10 at PLACL00573.)   She presented with mouth sores, toenail fungus, cracked skin on hands (xerodermatitis), stomach cramping, and body pain. *Id.* at PLACL00567-572: Dr. Byrd's notes; P's Ex. 11 at PLACL00853: Byrd's Attending Physician's Statement.)

<u>Dr. Morenz' Second IME: January 21, 2003</u>

Dr. Morenz recorded Plaintiff's treatment with Dr. Fox as being every other week, and her treatment with Dr. Jones as every four to six weeks.  She was seeing Dr. Byrd monthly.  (P's Ex. 11 at PLACL00630-629).  She reported that "her anxiety attacks [had] virtually disappeared, *id.* at PLACL00628-627, but Dr. Jones continued to prescribe 5 mg of Valium tablets for her to take before anxiety-provoking events such as the IME or depositions regarding Netwest, *id.* at PLACL00630.

According to the Diagnostic and Statistical Manual of Mental Disorders, he diagnosed Plaintiff with Axis I: major depression, recurrent, in partial remission; no Axis II diagnoses; Axis III, Dr. Byrd's fibromyalgia diagnosis; Axis IV: psychosocial stressors include ongoing litigation; and Axis V: GAF 70.   *Id.* at PLACL00626.

Dr. Morenz' assessment was that her depressive symptoms had improved, but she continued to feel depressed and to lack confidence.  *Id.*.  "She feels some hopelessness about her future, but she is no longer experiencing any suicidal symptoms.  She is tearful."  *Id.*  "Her mood showed a broad range, at time smiling appropriately, at other times tearful.  Her overall mood appeared slightly depressed." *Id.*

He noted, "a new complication since [he] last saw her was the development of fibromyalgia-like symptoms," *id.*, which diminished her energy and physical endurance.  *Id.* at PLACL00625.  She was being prescribed Naproxen 550 mg 3x a day for fibromyalgia pain, cyclobenzaprine (Flexeril) 10 mg to be taken up to 3x a day as needed for muscle spasms.  *Id.* at PLACL00630.  She had been referred to Dr. Noland, a neurologist, for an evaluation of her fibromyalgia symptoms and to Karen Disbro, a physical therapist, to relieve some of her symptoms.  *Id.*  She had started experiencing headaches on a continual basis, which spread to her shoulders.  *Id.*  She described flu like symptoms and tiredness that made her unable to do heavy cleaning and her husband had to do the vacuuming. *Id.*

He recorded that Plaintiff's primary complaint was poor memory and poor organizational skills, which most likely reflected her depression and lack of self confidence. *Id.* at PLACL00625  His mental status examination and Dr. Herring's neuropsychological examination found her memory functioning intact, with no significant cognitive deficits. *Id.* He confirmed that she was scattered and tangential in responding to questions and frequently had to be redirected. *Id.* She frequently pulled pill bottles or papers out of her purse, trying to remind herself of details. *Id.* at PLACL00626.

Plaintiff reported that daily she walked her dog for about 45 minutes. She enjoyed planting flowers and vegetables. She like to decorate her home and helped others decorate their homes. She was involved in her neighborhood homeowners' association. *Id.* at PLACL00629.

As to her ability to return to work, he concluded that she lacked the confidence to return to her prior occupation as a CEO. He found no specific objective limitation or skill deficit that would prevent her from taking on one of the type of development projects that she had managed in the past. He found that Plaintiff's treatment was appropriate for her depression, but that Plaintiff had not made returning to work a priority. Once the Netwest litigation was resolved, he anticipated further improvement, but he did not anticipate her symptoms would ever completely resolve until she returned to some type of meaningful work. He recommended "vocational rehabilitation" by initially working for another CEO to build her confidence. Once her confidence improved, she could then decide whether or not she wanted to attempt to find a position as a CEO or start another company herself. *Id.* at PLACL00625-623.

On March 10, 2003, Defendant concluded that with a GAF of 70 ("mild to no symptoms") and no evidence of significant restrictions and limitations, Plaintiff did not satisfy the definition of disability. *Id.* at PLACL00639.  Defendants erred to the extent they represented that Plaintiff's GAF of 70 signified mild to no symptoms because a GAF of 70 represents mild impairment, as distinguished from a GAF of 71 to 90, which is a

22

1   minimal impairment, which is certainly distinguishable from a finding of "no symptoms."

2   According to Defendants, the only evidence of disability was Plaintiff's subjective self

3   reporting that she lacked the confidence to undertake her prior occupation of being a

4   CEO.  (P's Ex. 12 at PLACL00644-43.)

5         On August 13, 2003, Dr. Byrd responded in a letter to Defendants that he had seen

6   Plaintiff most recently on August 1 and 13, 2003, and certified that she continued to

7   require both medical and psychiatric care because she still had severe depression and

8   concomitant fibromyalgia and remained totally disabled.  *Id.* at PLACL00663.

9         Plaintiff did not file an appeal, but she sent several letters objecting to the

10  termination of her benefits.  On September 18, 2003, UNUM responded to the Plaintiff,

11  noting that Dr. Morenz' treatment plan had not been implemented, and that such

12  compliance and filing monthly treatment forms were a requisite for receiving benefits

13  beyond August 8, 2002.  *Id.* at PLACL00674.  Additionally, UNUM referenced Dr.

14  Morenz' January 22, 2003, IME and his conclusion that she was making a choice not to

15  return to work based on her feeling that she was not capable of being a CEO.  *Id.*

16        Even though Plaintiff only sent letters objecting to the March 10, 2003, denial of

17  benefits, UNUM treated Plaintiff's objections like an appeal.  UNUM referred the claim

18  to a clinician/physician for a general medical review of Plaintiff's fibromyalgia symptoms

19  and asked the claim officer to follow-up regarding Dr. Byrd's referral of the Plaintiff for a

20  neurological evaluation and physical therapy.  *Id.* at PLACL00673.

21        Plaintiff responded that she never saw the neurologist and went to Naturally

22  Women instead of a physical therapist.  *Id.* at PLACL00677.

23        On October 8, 2003, Dr. Norman M. Bress, a Board Certified Internal Medicine

24  and Rheumatologist, reported that he had reviewed claimant's file, including Dr. Byrd's

25  records, and found no evidence to support a conclusion of disability based on

26  fibromyalgia.  *Id.* at PLACL00683-682.  He listed the negative or normal tests results in

27  the record that indicated the Plaintiff did not have a connective tissue disease.  *Id.* at

PLACL00683.  He noted that fibromyalgia is "a very controversial syndrome because of psychological issues, inappropriate pain behavior, and sometimes somatization."  *Id.* at PLACL00683-00682; *see also* Shaun Kerry, M.D., "Chronic Fatigue Syndrome: Long Term Health Maintenance," Somatization Disorder, http://www.cfsdoc.org/somat.htm, (explaining the distinction between fibromyalgia and somatization as the former being neurologically based and the latter being without medical explanation).

On November 12, 2003, UNUM wrote the Plaintiff's attorney, advising him that it affirmed its denial of benefits.  UNUM reiterated the following: 1) Plaintiff failed to comply with Dr. Morenz' recommendation for a treatment plan focusing on returning to work and instead saw a psychotherapist of her own choosing, Dr. Fox; 2) Dr. Morenz' second IME on January 22, 2003, found her to be considerably improved with mild to no symptoms (GAF 70)[11] and no objective limitations or skill deficits except her own subjective report that she did not feel confident enough to be a CEO; and 3)Plaintiff failed to follow-up with the neurological evaluation and physical therapy for fibromyalgia as recommended by Dr. Byrd and instead went to Naturally Women.  *Id.* at PLACL00691-686.  UNUM determined that by her failure to comply with her family practitioner's referrals to a neurologist and physical therapist, Plaintiff failed to satisfy the policy requirement that she be under the care and attendance of a physician for that condition: fibromyalgia.  (D's Trial brief at 19.)

<u>Total Disability Analysis</u>[12]

UNUM submits that its determination of no disability was made after a "thorough review of her entire claim file, including her claim of fibromyalgia," and was because she

---

[11]As this Court explained above, Defendants erred in concluding that a GAF rating of 70 represents mild to no symptoms.  Defendants' remaining reasons for finding that Plaintiff was not totally disabled are discussed below.

[12]The evidentiary record discussed in the Court's analysis has been cited in the previous sections of this Order or if not, it is cited here.

presented no objective medical evidence that she is not able to perform the substantial and material duties of her occupation on the basis of either fibromyalgia or depression." (D's Response at 14.)

"The sole issue is whether UNUMProvident correctly determined that plaintiff was no longer 'totally disabled' as of March 2003." (D's Response at 14.) In other words, "[t]he sole issue here is whether plaintiff met the contractual definition of 'total disability' [] when UNUMProvident terminated her benefits in March 2003." (D's Response at 1.)

The policy provides that "total disability" means that due to injuries or sickness "you are not able to perform the substantial and material duties of your occupation, and you are under the care and attendance of a physician. Defendants do not refer the Court to any policy requirement that Plaintiff present "objective medical evidence" to establish her disability. On the other hand, Plaintiff presents evidence that she was clinically treated by three doctors over a three year period for depression and treated the last year for concomitant fibromyalgia-like pain symptoms, and that all of her treating physician's concluded she was unable to perform the substantial and material duties of her occupation as a CEO of a major development corporation.

It is undisputed that Plaintiff was at all times under the care and attendance of several physicians for major depression. UNUM considered Plaintiff's onset date of disability to be February 8, 2001, and paid monthly benefits to her until February, 2002.

The Court finds that in February, 2002, UNUM accepted Plaintiff's status as totally disabled when it paid out benefits for another 6 months, until August 8, 2002, the time period UNUM estimated it would take the Plaintiff to fully recover and return to her occupation as a CEO.[13] Accordingly, the critical period of inquiry is from February,

---

[13]Defendants advanced payment of benefits on February 20, 2002, was based on its internal psychiatric medical consultant's review of Dr. Morenz' IME and conclusion that claimant had a psychiatric disorder with significant impairment despite substantial improvement since the onset date of disability and Dr. Morenz' prediction that significant further improvement could be expected with a greater intensification of treatment within 6 months. (P's Ex. 8 at PLACL00390.)

2002, to March 10, 2003, the date UNUM terminated Plaintiff's benefits based on a finding that she was not totally disabled.  Here, the Court's inquiry is whether the Plaintiff remained unable to perform the substantial and material duties of her occupation after February 2002,[14] or whether Plaintiff's condition improved so that as of March, 2003, she was capable of performing the duties of a CEO.

UNUM's determination that Plaintiff was totally disabled in February 2002, but would be able to return to work within in six months was based on the same type of subjective self reporting by the Plaintiff that UNUM reject in March 2003 because there was "no objective medical evidence" to support her claim of total disability.

UNUM's based its February, 2002, determination in large part on the IME conducted by Dr. Morenz on November 8, 2001.  UNUM determined that as of March 10, 2003, Plaintiff could perform the duties of a CEO based in large part on what it concluded from the IME conducted by Dr. Morenz on January 21, 2003.

Dr. Morenz' initial IME explained that based on the lack of any neurological findings for Plaintiff's cognitive difficulties, he concluded that her depression and anxiety interfered with her confidence, concentration, and focus, which reduced her cognitive efficiency and diminished her ability to carry out the tasks of her occupation.  He noted that she was still experiencing considerable affective discomfort especially with respect to ongoing problems at Netwest and ongoing litigation regarding Netwest.

In his opinion the primary obstacle to her full recovery was her lack of self-confidence, which in combination with depression and anxiety affected her ability to function as a leader and CEO.  He believed that her past treatment, aimed at amelioration of symptoms had been appropriate, but that she needed treatment to regain her self-confidence so that she could return to her occupation as a CEO.  He recommended

---

[14] UNUM denied benefits on March 10, 2003, because it found no ongoing support for any current restriction and limitation that would inhibit the ability to perform her occupation.  (P's Ex. 12 at PLACL00643.)

intensive treatment, perhaps twice-weekly and group therapy, by a psychologist and/or psychiatrist aimed at building her self-confidence to overcome her hesitancy to return to work.

In 2001, Dr. Morenz diagnosed major depression, single episode, in partial remission, panic disorder without agoraphobia, and a GAF of 70.

In 2003, Dr. Morenz diagnosed major depression, recurrent, in partial remission and a GAF of 70.

While he found her depressive symptoms improved and her anxiety all most entirely gone, he noted the addition of fibromyalgia-like pain and fatigue symptoms.  He noted that she remained affected by the psychosocial stressors of ongoing Netwest litigation.  As he had in 2001, he noted that neurologically her memory functions appeared intact, but that her responses to his questions were scattered and tangential.  He opined that her poor memory and organization problems were most likely a reflection of her depression and lack of self-confidence.

Again he identified that her major impediment to returning to her occupation as a CEO was her lack of self-confidence.  He believed that but for her lack of self-confidence, Plaintiff could take on *one*[15] project of the type she had previously managed, or she could work for a CEO, and from such experiences build her confidence so that eventually she would be capable of returning to her occupation.  He described her as *choosing* not to return to work because she had rejected opportunities to get involved in projects, but he concluded she did so because she was afraid of failing again.

While Dr. Morenz noted that Plaintiff's treating physicians were encouraging her to take on small projects like becoming involved in her homeowner's association to build her confidence, he criticized her treatment as being aimed at alleviating her depression, but failing to focus on returning to work, which in his opinion would return her self-

---

[15]The Court notes that as CEO at Netwest, the Plaintiff had managed several development projects at a time.

1   confidence and alleviate her depression.  Dr. Morenz did not address the failure of Dr.

2   Fox's efforts to buoy her self confidence or why after such self-confidence build

3   experiences she remained incapable of returning to her occupation.

4          After Plaintiff failed to see the psychotherapists recommended in Dr. Morenz'

5   treatment plan, Defendants ignored the results of Plaintiff's treatment by the

6   psychotherapist she alternatively chose, Dr. Fox.  There is no critique regarding the

7   effectiveness of his treatment, which was aimed at "helping her to be all she desired to

8   be."  (P's Ex. 9 at PLACL00470.)  Dr. Fox encouraged her to take on small community

9   projects, but his efforts were met with limited success.  He responded to UNUM's

10  questioning regarding when she might be capable of returning to work by explaining that

11  she remained in acute distress, that he was trying to stabilize her, and that focusing on

12  returning to work would be premature.   UNUM does not present any evidence to dispute

13  Dr. Fox' opinion.  Defendants ignored the monthly treatment reports they provided to the

14  Plaintiff for her to use during the six-months they anticipated her recovery, which she and

15  her treating physicians filed.  Without ever addressing or critiquing the treatment actually

16  received by the Plaintiff during the six-month period from February 2002 to August 2002,

17  Defendants summarily rejected her claim of disability because she failed to follow Dr.

18  Morenz' treatment plan.  Defendants offer no evidence to show that the treatment Plaintiff

19  received from her chosen doctors, especially her psychotherapist Dr. Fox, was deficient

20  or inappropriate to address her depression and encourage her to return to being an active

21  participant in her community, which if successful, would have supported Defendants'

22  conclusion that Plaintiff chose not to return to her occupation as a CEO.

23         The Court finds that Defendants fail to present any evidence to challenge the

24  validity of Plaintiff's treating physicians' conclusions that her depression, which included

25  symptoms of mental confusion, low self esteem, chronic pain and fatigue, prevented her

26  from returning to her occupation as a CEO.

27

28

UNUM did criticize the Plaintiff's failure to secure intensive psychotherapy, which according to Dr. Morenz may have enabled her to return to work by August 8, 2002. However, UNUM refused to pay for such intensive treatment from Dr. Fox, whereas UNUM had offered to pay for intensive therapy from one of the psychotherapists recommended by Dr Morenz. The Court notes that there is nothing in the record to suggest that UNUM had any authority to designate Plaintiff's treating physician or treatment plan. There is nothing in the record to suggest that Dr. Fox was distinguishable as a psychotherapist from any of the psychotherapists suggested by Dr. Morenz. The Court notes that Dr. Morenz erred when he reported that Plaintiff was only seeing Dr. Fox once every other week. Initially, Plaintiff was seeing Dr. Fox 3 times a week, an intensive treatment regimen as suggested by Dr. Morenz, but her visits dropped off to once a month by the time Dr. Morenz conducted the second IME. There is some evidence in the record to suggest that there were financial constraints to Plaintiff's ability to secure treatment.

UNUM disregarded Dr. Byrd's letter of August 13, 2003, that he had seen Plaintiff most recently on August 1 and 13, 2003, and she continued to require both medical and psychiatric care because she still had severe depression and concomitant fibromyalgia-like symptoms that resulted in her being totally disabled. *Supra* at 23 (citing (P's Ex. 12 at PLACL00663).) Dr. Byrd's observations coincide with the explanation of Dr. Bress, the rheumatologist that reviewed Plaintiff's medical records for Defendants, which was that fibromyalgia is a "very controversial syndrome because of psychological issues, inappropriate pain behavior, and sometimes somatization." *Supra* at 23 (citing (P's Ex. 12 at PLACL00683-00682). While there is no evidence of any neurological basis for a finding of total disability based on a diagnosis of fibromyalgia, this was not asserted by the Plaintiff. She claimed, which is consistent with the clinical record in this case, that she experienced chronic pain and fatigue, concomitant with her depression. Defendants should have considered her treating physicians's reports that she was experiencing

fibromyalgia-like symptoms, such as chronic pain and fatigue, which along with her other symptoms of depression, prevented her from performing her prior  occupation as a CEO.

Conclusion

The Court finds that Plaintiff, being totally disabled as of February, 2002, when Defendants issued the six-month advanced payment for benefits to August, 2002, the date UNUM anticipated Plaintiff would be able to return to work, remained totally disabled on March 10, 2003.  Defendants' IME of the Plaintiff established that her condition did not substantially improve.  Her GAF rating remained 70.  While her anxiety improved, her diagnosis of major depression, single episode, expanded to major depression, recurrent. Plaintiff at all times suffered from major depression, at all times was under the care of and attendance of several physicians for this condition, which at all times caused her to be unable to perform the substantial and material duties of her occupation as a CEO of a major development corporation.  The Court finds that Plaintiff has established she is totally disabled as defined by the terms of the policy.

**Accordingly,**

**IT IS ORDERED** that the Plaintiff prevails on her claim for benefits, and Defendants shall pay benefits owed from the date of termination, March 10, 2003, with interest and shall reinstate Plaintiff's monthly benefits under the policy.

**IT IS FURTHER ORDERED** that Judgment shall be entered accordingly.

DATED this 25th day of September, 2006.


David C. Bury
United States District Judge